v. New York, No. 19-198. Good morning. May it please the Court, my name is Robert Reckner, and I'm here for Appellant Leon Sims. This is a case about a deliberate indifference to my client's serious medical needs. This is not an excessive force case. The reason we discuss violence in the brief is because when you're a paranoid person with bipolar or schizoaffective disorder, being around violence and being subjected to violence is something that you can tolerate even less than an ordinary person can. It works on the disease. It makes it worse. And so that's why we talk about violence. But I want to be clear, this is a deliberate indifference case here on appeal at its core. Now, this is a serious medical condition, bipolar with schizoaffective disorder. Treating it requires regular, stable medication and counseling. That is the core treatment that he requires. And if he doesn't get it, it's dangerous. He could kill himself. And people at Rikers have. And in fact, the criminal court judges that were presiding over his case ordered him on suicide watch. They were so concerned about this possibility. So that is a serious medical condition with a serious negative consequence if it isn't treated properly. He gets to Rikers Island. He's given no medication. In fact, he isn't even given a bed to sleep on. He's then thrust out into an area where he receives. I understood that he was generally given medication, and it was only after he three times went to Bellevue on his return that on reprocessing in, he did not have medication for three days each time. You're talking about his initial arrival? Yes. His initial arrival, no medication, and then he's thrust into the violence of Rikers Island. He immediately decompensates, and he gets sent to a psychiatric emergency room. His disease takes over. The symptoms become so severe he needs to go to the emergency room. Did he come in with a prescription? Had he been taking medication before? He did not, but he came in with symptoms that were so blatant that anyone would have realized that he needed psychiatric treatment. How long was it before he went to Bellevue for the first time? I believe it was a period of weeks. And then he comes back, and the stabilization that occurred at Bellevue, it happens again. He goes to the intake area. He's deprived all treatment for three or four days, thrust back into violence. When he comes back from Bellevue, he comes with a prescription? Yes, Your Honor. And he's provided medication? No, Your Honor. No? No. When does he first – I thought the – I understood his allegations to be that although he was prescribed medication and it was delivered to him, that monitoring was inadequate to make sure that he took the medication. There are different phases that we're discussing here. When he first returns to Rikers Island, there is a complete denial of medication and treatment. Notwithstanding that there's a prescription? Correct, Your Honor. There was a prescription, but it was not filled. Correct, Your Honor. And I think that alone is enough to reverse – we go back to the district court for further proceedings. However, when he is finally sort of admitted into AMKC, he's then effectively denied medication because he's paranoid. And the staff are physically beating him, and in his paranoid state, he doesn't want to take the medication. Now, I understand that he has a constitutional right to do that, but it's not as though there are only two options, that you let him do whatever he wants or you force it down his throat. There's in fact – the medicine is the intermediate option. You counsel him. You need to monitor medication compliance so you know if the drugs are working or not. You know whether he's going to need additional observation because he hasn't been taking his medication. This is important enough that several pages were in fact devoted to it. But what kind of counseling do you need other than giving somebody medicine that they're supposed to take and that according to you, and I think it's sound, he would certainly know that he needs medication? Well, it's because – this is somebody with a deep paranoia, schizoaffective disorder. You need counseling that says, look, just because you may feel good today, you still need to take your medicine consistently. In fact, today at Kirby, that is a significant portion of the treatment he's been given because if – and we certainly hope that ultimately he's allowed to live in a community setting in the future, making sure that he continues to take his medication, that he monitors his stress levels, this is how he's going to be able to live peacefully in society. So this isn't just a matter of, you know, look, you understand you really need to take this medicine. This is in fact a deep part of the therapy. And that's, I believe, satisfies the first prong. The second prong is the reasonable person or the objective test, and I think that certainly anyone knows that you need medication and you need treatment with a severe mental disorder like Mr. Sims has and that certainly the medical staff at Kirby has done that, specifically the Khoraisen staff. Now, you could look at my complaint and say, well, you didn't put in enough detail. You could say that. And if the judge had said it, we would have in advance. And I believe that's really the second important part of the argument here is that this came out of the blue. We understand that we are arguing over whether or not the Monell allegations were sufficient to make the city liable for this deprivation of medical care, but we didn't see that the underlying allegations were insufficient. In fact, this is we've gone through multiple complaints, several years of litigation, and we'd never heard anything about it. How many complaints did you file? Four. We were on our third amended complaint, although the third one or the fourth one was in response to a motion to dismiss, and the third one where we amplified our Monell pleadings because that was what they were claiming was insufficient. All we needed the district court judge, either in response to the pre-motion letter or even after briefing, was to say, in a minute order, I'm concerned that maybe you haven't pled an underlying constitutional deprivation. You come talk to me about that. Submit an additional briefing. Whatever it was, we would have been on notice and we would have addressed it directly, but that didn't happen, so we didn't. And then I'm running out of time here. We also have, I think, a substantial briefing about the underlying Monell allegations. I don't know that it's necessary for this Court to address them in the first instance, but certainly under the circumstances, I briefed them in the event that you did want to address them in the first instance, and I believe that there is a longstanding history of problems at Rikers Island with medical care, specifically medical care for persons with mental illness and with violence, and not only was there a lack of training, which the mayor admits to, it also amounted to a de facto policy. So accepting the fact that many people who are admitted to Rikers Island have mental problems of various kinds and are acting out often in bizarre ways, why is it — why was it obvious that your client needed some additional and special attention? Because of the severity of his symptoms. I mean, this is — he is an extreme case. This is not — and to be clear, 40 percent of the people at Rikers Island do have mental health issues. And a lot more needs to be done. I know the point cuts both ways. I mean, if 40 percent of the people have mental health problems, then they ought to have close monitoring of people's mental health problems. On the other hand, you're saying that they disregarded his problem. But 40 percent of them have problems, and they act out on them. And in this instance, when he decompensated, he was sent to a competent facility, and he came back, and he came back with a prescription. And he could ask people to fill a prescription, could he not? And when it was filled, he didn't take it. It's kind of hard to see why this is the case on Rikers Island, where no doubt many people could say that they were medically neglected, that this is one that stands out. Well, his symptoms were severe enough that he returned to the ER two more times when he decompensated. In addition, at Rikers Island, it's not as simple as saying, hi, I need some medication, I have a prescription. They're in complete control.  So, you know, he doesn't have a lot of options. And I'll note that part of the complaint is that his family was calling repeatedly saying, why isn't my son getting treatment? And it was being ignored. So they were on notice that this was a particularly severe case that needed to be treated as such. How is his being returned to Bellevue consistent with deliberate indifference? Doesn't that show that they were attending to his needs? Well, I mean, it's like an infection that's allowed to spread out of control, and then it gets a little bit of treatment, it gets better at a proper hospital, but then you stop giving them the antibiotics and the infection gets bad again, and then you go back to the hospital. Mental illness is a different and more chronic condition than an infection. I agree. And I would say that this is where the inferences that I'm allowed in a motion to dismiss matter is because you could — that's the way the district court looked at it. But I would say that this is equally, and in fact what happened, is that this was evidence that he — his denial of medical care was causing his symptoms to become so much worse that he went to the ER. And those are two different ways of looking at the same evidence. And I'd say in this procedural posture, our explanation controls, which is this is evidence of the damage that was done, not that they were finally just giving improper treatment. Okay. Well, we'll hear from the city. Thank you. Good morning, and may it please the Court. Melanie West for the Appellees. This appeal is now narrowed to the inadequate medical treatment claims, so I will address that. To begin with, based on the complaint, Mr. Sims did not come to Rikers with a diagnosis, a prescription, or any sort of treatment regimen. All of the treatment that he received started at Rikers Island. So to discuss the diagnosis that he had, I mean, that's not part of the complaint. And the complaint only alleges that DOC should have known that he needed treatment. And, again, there's no allegation as to the severity of his symptoms when he arrived at Rikers Island, no factual allegations whatsoever. Just to refresh my recollection, the original complaint included allegations of excessive force and other wrongs as well. Correct. And included Corizon as a defendant and Bellevue itself, I guess. Bellevue as well. And Corizon is still a defendant in this case to the extent that they provided medical services at Rikers. Thank you. And so what we have is, you know, allegations that while Mr. Sims was at Rikers, he was being given medication that he refused to take because he was paranoid. And then we have the allegation that he decompensated and went to Bellevue several times, which is, you know, consistent with refusing medication. And so also consistent, isn't it, with either inadequate treatment. I mean, we have the record or allegations that his parents were calling Rikers and calling their son's condition to the attention of the authorities at Rikers. And in a motion to dismiss stage, why is it fair to draw the inference that he was actually getting treated from the fact that he went to Bellevue on several occasions as opposed to the contrary inference? I mean, I think, you know, we need more than imperfect treatment for it to rise to the level of a constitutional deprivation. It may be that it was some combination of factors, including his own refusal to take medication, and perhaps more could have been done to prevent him from going to Bellevue. But in order to show that he was receiving inadequate medical treatment that rises to the level of a constitutional deprivation, I mean, the factual allegations here really point to the opposite, that he was being given medication, that every time his condition worsened, he was sent to a facility that was competent to treat that. And then that ultimately, after a period of, we're talking about a period of three months here where he was at Rikers, that he was ultimately sent to a different facility that he is happy with. I mean, mental health problems take time to diagnose and treat properly. There's no allegation that he had a diagnosis or a treatment regimen when he came to Rikers Island, and within a period of three months. Prescription, I believe, was after he arrived at Rikers Island. And so the allegation about denial of medication is that every time he came back from Bellevue, he was in an intake area for a period of three to four days. And during that time, the complaint alleges he was not given his medication. To the extent that, you know, we take that as true for the purposes of this stage, that's a gap or an interruption in his treatment that still doesn't rise to the sufficiently serious level of constitutional deprivation. He's not alleged any injury as a result. There's no allegation. The allegation was also that he routinely, on readmission, was not given his medication, and he was forced to sleep on the floor, that there were harsh, particularly harsh conditions in that setting, which, you know, one might be able to infer that he would be damaged and further, I mean, certainly not getting any special care because of his results. Maybe that's a deliberate indifference, systemic kind of deliberate indifference. That's how readmission happens. There's no specific allegation as to any injury that he sustained as a result of that. And to the extent that it was a three- or four-day period each time, you know, without more as to what happened to him while he was there or what the result was of, you know, allegedly being denied medication, there's nothing that brings this up to the sufficiently serious level, objectively serious, to rise to the level of a constitutional deprivation. It may well be that it wasn't perfect, that the, you know, he wasn't administered medication perfectly, but that doesn't bring us to deliberate indifference here. Unless the Court has any further questions, we ask that you affirm. Thank you. Mr. Richter, you have two more minutes. Thank you, Your Honor. One point that I think needs to be made is that part of his treatment is that it has to be predictable. And one of our allegations is, is that gaps in treatment for him are more serious and more dangerous than they are in other medical conditions. And the risk here, as I said, is severe. You know, he could have killed himself and multiple people at Rikers Island who were denied medical care in similar ways have killed himself. That's a real danger. And they say, you know, you have to look at how little it would have taken for them to comply, to just give him the medication he needed and write down whether or not he was taking it. And to put him in an area where he wasn't subjected to violence, there's the North Infirmary Complex or Center, the NIC, at Rikers Island, which is a place for people that are sick. And obviously there's other facilities like Bellevue and Kirby. The reason people don't take their medication is that they believe they don't need their medication. It could be because it makes them sick, but ordinarily in this kind of situation, you're talking about somebody who doesn't think that they need the medication. If he doesn't think he needs the medication, why should we tax the people around him with knowing that he needs it? Because it's an important part of the medical treatment. Because it's a known part of the medical treatment. In fact, it was so important that they devoted two pages to it in the report regarding Corison's failures. This is one of the vital ways that you keep somebody with, particularly with schizoaffective disorder, peaceful and capable of handling their own lives. Did he arrive with a diagnosis? He had a psych evaluation at the Tombs. I don't know at this moment whether he... At the Tombs. That's before he went to... That's correct. I should say the MDC. Yes. So they knew that he had... The question is, did he arrive with a diagnosis? I don't know that he arrived with a specific diagnosis, but there was an understanding that he had serious mental health issues that were going to require treatment. And when he returned from Bellevue, certainly they knew that he needed medication and that there was a working diagnosis. And they still did exactly the same thing to him over and over and over again. And that's the deliberate indifference. Thank you very much. We have the arguments. Thank you. All right. That concludes our oral arguments today. We have two cases on submission, U.S. v. Sargentakis and U.S. v. Swinton. We'll reserve decision on all of these cases. Thank you.